[No. 1968.]

ASBERRY RICKS *v.* THE STATE.

1. THEFT — EVIDENCE.— DECLARATIONS of a co-conspirator, made in the absence of the defendant, and after the consummation of the conspiracy, are not admissible in evidence against the defendant. See the opinion *in extenso* for evidence of such character, the admission of which is *held* error.

2. SAME — INTENT — CHARGE OF THE COURT.— The defendant being alone upon trial for theft, and the main issue being that of his intent, the trial court admitted the declarations of his co-defendants, made after the consummation of the offense and in the absence of the defendant, and instructed the jury as follows: " The declarations of John and Reuben Ricks, made when the defendant Asberry Ricks was not present, and admitted in evidence, are competent evidence to show the intent with which said John and Reuben Ricks acted in the matter, but are not binding on the defendant Asberry Ricks, nor competent to prove knowledge or intent on the part of defendant Asberry Ricks." *Held*, that the intent of John and Reuben Ricks could not be made the issue on the trial of the defendant, unless the proof showed that the defendant, in acting with his co-defendants, acted with knowledge and criminal intent.

3. SAME.— The concluding clause of the charge, to the effect that the declarations of the co-defendants were "not binding upon the defendant, nor competent to prove knowledge and intent" on his part, did not operate to cure the injurious effect of the incompetent evidence, nor withdraw the same from the consideration of the jury.

4. PRACTICE — PRIVILEGE OF COUNSEL.— Note the opinion for comments of this court upon the unwarranted use of vituperative language in argument before the jury.

5. SAME — EVIDENCE.— Assaults upon the veracity of a witness, made only by counsel in argument, do not constitute such an impeachment of the credibility of the witness as will authorize the admission of testimony to sustain his reputation for truth and veracity.

6. THEFT — FACT CASE.— See the statement of the case for evidence *held* insufficient to support a conviction for theft, inasmuch as it fails to establish a criminal intent.

APPEAL from the District Court of Hunt. Tried below before the Hon. J. A. B. Putman.

On January 15, 1885, the grand jury of Hunt county indicted Asberry, Reuben and John Ricks jointly, charging them with theft of six hogs valued at $6 each, the property of O. B. Robinson, in Hunt county, Texas, on the 30th day of November, 1884. A severance was had, and at the July term, 1885, of the court, appellant was convicted and sentenced to two years' confinement in the penitentiary.

O. B. Robinson was the first witness for the State. He testified that he lost four hogs in Hunt county, Texas, in November, 1884. They were taken, without the witness's consent, from their range in the Sabine bottom about a mile and a half from witness's house. In the spring of 1883 the witness bought a sow and six pigs from Thornton Pollard, paying him therefor $15 in wheat. The pigs were black and white spotted, in color. The pigs, when purchased by the witness, were in the mark of Pollard, which was a swallow-fork and underbit in each ear. The witness saw the pigs on their range every few days, or at least every week, until about the 1st of November, 1884. Witness saw the carcasses of four of those pigs on the 30th day of November, 1884. Two of them he saw in the town of Lone Oak, one at Doctor Coppage's house, and the other at Mr. Crooks's. A third one he found at the house of Reuben Ricks, and the fourth at the house occupied by John Ricks and the defendant. The carcasses found at Coppage's and Crooks's houses were entire, though cleaned, and witness identified them by the ear-marks, size and shape. The carcasses found at the houses of the Rickses were cut up, but the heads, with the ears entire, were found.

The ears bore the ear-marks described. The hogs when stolen were about seventeen months old. Witness was standing at Gandy's gin in Lone Oak, about 4 o'clock on the evening of Saturday, November 30, 1884. Reuben Ricks, his wife and John Ricks passed, in a wagon. He noticed that they had the carcass of one hog in the wagon, but had no suspicion that it was the carcass of his hog, until Mr. James Smith gave him certain information on which he proceeded to act. Following up that information witness found the carcass of one of his hogs at Doctor Coppage's and another at Crooks's. He went immediately to old man Reuben Ricks about them. Reuben Ricks insisted to witness that the hogs were marked with a crop and underbit in each ear. He did not claim to own any hogs marked with a swallow-fork and underbit in each ear. Several parties, including James Smith, Doctor Coppage and Thornton Pollard, went to the houses of Coppage and Crooks, and examined the carcasses, and found them in the mark described, *i. e.*, — a swallow-fork and an underbit in each ear. The same party then went to the houses occupied by the Rickses, and found the other two carcasses — one at Reuben's and the other at John and defendant's. Defendant was present when the last carcass was found. Neither John nor Reuben Ricks claimed the hogs if they were marked with a swallow-fork and underbit in each ear. The witness afterwards found the three remaining hogs of the bunch he bought of Pollard,— the old sow and two pigs,— on the range. All of the hogs mentioned were gentle animals, and when the four were taken they were worth $6 apiece. They were not more than half fatted, but had commenced to increase in flesh on the prevailing mast.

Cross-examined, the witness stated that he lived in a thickly settled neighborhood about two and a half miles from the little town of Lone Oak in Hunt county. That town was usually resorted to by many of witness's neighbors on Saturdays, to trade. Witness and Thornton Pollard were both in Lone Oak on the day the carcasses of the hogs were taken there by John and Reuben and Mrs. Reuben Ricks. Ricks's wagon, when witness saw it going towards the stores in town, passed within fifteen or twenty feet of witness, who was standing on the cotton platform at Gandy's gin. . The Ricks wagon stopped in front of Crooks's grocery store. Doctor Coppage's practice (of medicine) extends over witness's neighborhood. In going from L. C. Gooch's place to Lone Oak, the traveler on the direct road would pass the houses of Thornton Pollard and eight or ten other people. The four hogs, when taken, would have weighed about four hundred and twenty-five pounds

net. In estimating their value, witness estimated what they were worth for fattening purposes. They were suitable only for pork. They were worth more alive than dead, at the time they were taken, as they were not then fat. Mrs. Ricks was present at the interview between witness and Reuben Ricks, and heard all that passed. Reuben Ricks did not tell witness at that interview (in Lone Oak) that he had two more hogs at home in the same mark.

Re-examined, the witness testified that, at the interview in Lone Oak, Reuben Ricks claimed that the mark of the hogs he had killed and sold was a crop and underbit in each ear, and that he had lost hogs in that mark some time before, and had authorized the boys, John Ricks and defendant, to get them up.

Re-crossed, the witness stated that none of the Ricks family made any apparent effort to conceal the carcasses, but, on the contrary, exhibited every piece of the flesh, including the unmutilated ears. They also exhibited the hair scraped from the hogs at the slaughter place. The defendant was not in Lone Oak with Reuben and John Ricks on November 30th, nor was he present at Reuben's house when the pork was discovered there, but was present at the house occupied by him, John Ricks and Gooch, when the remaining carcass was found. He said nothing. Reuben Ricks owned a large number of hogs in various marks. Witness knew that there were a large number of hogs in the range of the same size, color and shape as his.

James Smith was the next witness for the State. He testified that he lived on O. B. Robinson's place in November, 1884, and knew the hogs in controversy. They were marked with a swallow-fork and underbit in each ear. The original bunch included an old sow and six shoats. The six pigs were of the same age and size and in the same mark. They were quite gentle, ran about witness's house, and were frequently fed by the witness. Witness saw the defendant in the range of the hogs on the day before the theft of the hogs was alleged to have been committed. He was attended by L. C. Gooch; said that he was hog hunting, and asked witness if he had seen any hogs. Witness replied that he had seen a few. Witness was in the town of Lone Oak on the day on which Reuben and John Ricks brought the carcasses of two hogs to town. Witness went with Robinson, Pollard and others to the houses of Coppage and Crooks, and examined the carcasses of two hogs. The marks on each were swallow-fork and underbit in each ear.

Cross-examined, witness said that he knew Robinson's hogs as well as Robinson did himself. Witness owned hogs on the same

range, and he and Robinson looked after each other's hogs. Witness identified the carcasses at Coppage's and Crooks's only by their ear-marks. There was nothing peculiar about the size and shape of the hogs that the witness was aware of. Witness could not have distinguished them from other hogs in the same mark. The range contained many hogs of the same shape and age. A few days after the discovery of the carcasses, witness and Robinson found the old sow and the two remaining pigs on the range, drove them to Robinson's house, and butchered them.

Doctor Coppage testified, for the State, that he got a slaughtered hog from Reuben Ricks on or about the last day of November, 1884. On the day previous, or on the morning of the same day, Reuben Ricks proposed to give witness a hog in payment of a medical bill, and witness accepted the offer. Reuben accordingly brought him the dressed carcass of a hog. Witness examined the ear-marks, but was unable to decide whether the mark was a swallow-fork and underbit in each ear, or a crop and underbit in each ear. The ear had the appearance of having been folded and cut, the cut making a slight curve somewhat deeper in the center than at the points. Witness thought that the mark was intended to be a crop and underbit in each ear. If it was a swallow-fork, it was a shallow one. Shortly after the carcass was delivered to witness, Mr. O. B. Robinson came to witness's house, claimed, and took the hog away.

Thornton Pollard testified, for the State, that in the spring of 1883 he sold a sow and six pigs to Mr. O. B. Robinson. The pigs were in the witness's mark,— a swallow-fork and underbit in each ear. Witness had lived at Lone Oak twenty-five years, during which time he had used the mark described. He knew of no one else in that neighborhood ever having given the said mark. Witness had lived in the neighborhood of the Ricks family during the last ten years. The defendant had been a member of that family during that period. Witness was in the town of Lone Oak on the Saturday that Reuben and John Ricks took the carcasses of two hogs to that town. Witness saw the carcass at Doctor Coppage's, and also that at Mr. Crooks's. The ears on those two carcasses bore witness's mark. Alive and on the range those two hogs were worth $5 or $6 each. Witness had seen the hogs he sold Robinson on the range after the sale. The witness recognized the carcasses at Lone Oak as carcasses of Robinson's hogs only by the ear-marks. Witness's mark was placed on record just after the close of the war. Robinson's hogs, on foot, were worth $6 or $7 each.

Cross-examined, the witness stated that Reuben and John Ricks

arrived in Lone Oak with the slaughtered hogs about the middle of the afternoon on Saturday, November 30, 1884. The usual large Saturday crowd were in town. The road from the residences of the Ricks families to Lone Oak passed by and near witness's house. In estimating the value of the Robinson hogs, witness estimated the sum they would bring fattened. Mast-fed pork at that time of the year was worth four cents per pound. The hogs were worth more on foot, alive, than dressed. The four hogs would have netted each a hundred pounds or more.

L. C. Gooch testified, for the State, that he lived about a half mile from the house of Reuben Ricks, the father of John Ricks and defendant. John Ricks and the defendant lived at the house of witness in November, 1884, and intended, or had arranged, to make a crop in that place in 1885. On Friday morning, November 29, 1884, defendant and John Ricks drove four black and white spotted hogs to witness's house and penned them there. Those hogs were marked with a swallow-fork and underbit in each ear. On the next morning Reuben Ricks and defendant killed the said hogs. Reuben Ricks and John Ricks divided those hogs between them after dressing them. Reuben took home the smaller of his two. John took home the smaller of his two. The other two were then taken by Reuben and John to Lone Oak to sell. Witness knew nothing about the hogs, but supposed they belonged to Reuben Ricks. Witness had been in the county but a couple of months, and was not familiar with the hog marks of any of his neighbors. Witness went into the bottom hog-hunting with defendant before these hogs were driven up and killed. He went because requested to do so by defendant. They did not find any. Defendant did not say what hogs, nor what mark, he was looking for, only that he was hunting hogs belonging to his father, Reuben Ricks. Witness had no interest in the hogs killed, and did not get any of the pork.

Cross-examined, the witness said that a few days before the slaughter of these hogs, he heard old man Reuben Ricks tell John Ricks that if he would hunt and find a bunch of hogs which had strayed during the previous winter, he, Reuben Ricks, would give him, John, one-half of them. John promised to make search for them. Defendant went with John Ricks, at John's request, and witness did also, though he told John that he would not know the hogs. Defendant said that he did not know them. No hogs were found. John Ricks said nothing about the description of the hogs. Witness left John Ricks and defendant, in the bottom, still hog hunting, about noon, and returned to the house. John and defendant drove up the four hogs about 4 o'clock in the afternoon, and

penned them in an inclosure some fifteen or twenty feet from the public road. The hogs remained in that pen until the next morning, when old man Reuben Ricks arrived, and with the aid of defendant and witness slaughtered them. Neither witness nor defendant had or claimed any interest in the hogs or meat. Witness did not know the hogs and heard defendant say that he did not know them. The smallest of the four hogs weighed about seventy-five pounds; the largest about one hundred and twenty-five pounds, and the remaining two about one hundred and five pounds each. The hogs while in the pen, and afterwards when dressed and hung up, were in plain view of travelers on the public road. The State closed.

Henderson Gentry was the first witness for the defense. He testified that he had known the Ricks family about six years, during which time he had lived from a half to two miles and a half from them. He knew the old hog mark of Reuben Ricks to be a crop and underbit in the right and a swallow-fork and underbit in the left ear. Thornton Pollard's mark was a swallow-fork and an underbit in each ear. Some one of the Ricks family, to the knowledge of the witness, gave the same mark as did Pollard,— which one, witness did not know. Witness had seen hogs belonging to the Ricks family in that mark on old man Reuben Ricks's place, and in his hog-pen. Witness knew that, in the winter of 1883, the Ricks family owned a sow and six pigs in the Pollard mark. They were black and white spotted animals, and ran in the Sabine bottom. Witness knew the hogs described to belong to the Ricks family, just as he knew the hogs of any other neighbor. Witness saw old man Ricks hunting that bunch of hogs in the spring of 1884. He inquired for them and said that they had strayed off. Pork in the fall of 1884 was worth four cents per pound net.

Cross-examined, the witness said that he was in no way related to any one of the Ricks family. He was subpœnaed in this case for the first time during the present week of this term of court, and was brought into court by attachment. When the witness knew the Ricks hogs in the swallow-fork and underbit mark, he knew that Pollard gave the same mark.

Levi Smith testified, for the defense, that he knew the Ricks family hog mark. That mark was usually a crop and underbit in the right and swallow-fork and underbit in the left ear. Reuben Ricks, for the last three years, had owned hogs marked with a swallow-fork and underbit in each ear. Witness knew this fact from seeing hogs in that mark about his place, and seeing him feed hogs in the bottom in that mark.

Cross-examined, witness stated that Reuben Ricks was his father-

in law. Witness did not know of his own knowledge how Reuben Ricks came by the swallow-fork and underbit in each ear-mark, but had understood that he got the hogs from witness's wife.

Rufus Allison testified, for the defense, that in May, 1884, he saw old man Ricks hunting a bunch of hogs marked swallow-fork and underbit in each ear, which he claimed had strayed off. Ricks promised to give witness half of that bunch of hogs if witness would find and butcher them for him. Witness knew nothing about Mr. Ricks's mark except what he, Ricks, told him.

Elizabeth Ricks, the wife of Reuben Ricks, and step-mother of the defendant, testified that her husband's hog mark was a crop and underbit in the right and a swallow-fork and underbit in the left ear. He, however, owned hogs marked with a swallow-fork and underbit in each ear, and came by them in this wise: Several years ago the witness's brother gave her a gilt. That gilt bore pigs, and witness gave one of the pigs, a sow, to her step-daughter, Bettie Ricks. That pig, in the course of swinish events, fulfilled the law of propagation, and brought forth a litter of her kind, which litter was raised to maturity about the house, and slaughtered. Bettie's sow conceived again and brought forth a second litter in the spring of 1883. The original hog mark of Reuben Ricks was slightly changed on Bettie's pig (when first presented by witness), in order to distinguish it from Reuben's hog stock. The change was made by cutting a swallow-fork in the right ear instead of a crop, making her mark a swallow-fork and underbit in each ear, which mark was perpetuated in her offspring. When Bettie married, witness provided her with her wedding trosseau, and Bettie conveyed to witness her sow and five pigs. Those animals afterwards, some time in the winter of 1883–1884, strayed off. Some time before the hogs alleged to be stolen by defendant were killed, witness heard her husband tell his son John, that if he would find and slaughter these hogs he would give him half of them. Defendant was not present when Reuben Ricks made that proposition to John.

Cross-examined, the witness said that the hogs whose history she had attempted to relate ran in the Sabine bottom or on Dunn's creek near the Odle place. Witness did not see them marked, but saw them about the place after they were marked. Witness's knowledge of Reuben Ricks's hogs, except as to those which ranged about the house, was obtained in conversations with the family. She knew of the family killing three hogs in the swallow-fork and underbit in each ear-mark. She knew that to be Bettie Ricks's mark.

The defendant concluded his evidence by introducing the record

of marks and brands of Hunt county. Reuben Ricks's mark, recorded in 1880, was a crop and underbit in the right and a swallow-fork and underbit in the left ear. The record began in 1875, but contained no record of the mark of Thornton Pollard. Charley Pollard's mark, recorded on January, 1885, was the same as Reuben Ricks's. An older record of marks was destroyed by fire several years ago. The record showed that many persons gave the same ear-marks.

The State called James Payne in rebuttal. He testified that he was in the town of Lone Oak on the day that Reuben and John Ricks brought two dressed hogs into that town. Witness, Bob Etter and John Ricks went to Crooks's house to examine the hog left there by the Rickses. That hog was in the mark of Thornton Pollard, which was a swallow-fork and underbit in each ear. Witness had known that mark as Pollard's for years, and had never known it to belong to anybody else in Hunt county. John Ricks claimed that the mark of the hog at Crooks's was a crop and swallow-fork in each ear. He then said that if Robinson had not got mad and cut up, the matter could have been settled without trouble. Witness had known the Ricks family, father and sons, for ten years, during which time they had lived near Thornton Pollard. Witness never heard John Ricks make any claim to the swallow-fork and underbit in each ear-mark. At the time that the alleged stolen hogs were taken and slaughtered, they were worth six or seven dollars each.

The cross-examination developed nothing of a material character. The witness testified that he went with the party to examine the premises of Reuben Ricks and Gooch. No effort at concealment was made by any member of the Ricks family. On the contrary, they pointed out the pieces of meat, the unmutilated ears, in Pollard's mark, and the place of slaughter where the hair was found. Defendant, who was seen at Gooch's, made no statement about the matter.

The motion for new trial raised the questions discussed in the opinion.

*Terhune & Yoakum* and *Upthegrove & Hefner*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

HURT, JUDGE. On January 5, 1885, Asberry, John and Reuben Ricks were jointly indicted for the theft of six hogs, the property of

O. B. Robinson. There being a severance, Asberry was tried alone, convicted and sentenced to two years' confinement in the penitentiary; and from this judgment and sentence he appeals.

It is insisted that the court erred in admitting in evidence the declarations of John and Reuben Ricks, the defendant not being present.

Robinson, the prosecutor, claimed that his hogs were marked with a swallow-fork and underbit in each ear. This mark was on the hogs killed by Reuben and defendant, and two of them were taken to Lone Oak by Reuben and John and sold, one to Dr. Coppage and the other to Crooks. The hogs were killed by Reuben and defendant on Saturday morning, and on the same day two of the hogs were taken to Lone Oak by Reuben and John Ricks, and sold to Coppage and Crooks. Robinson, the owner, was in Lone Oak when Reuben and John carried the hogs to that place, and, receiving information regarding his hogs from James Smith, he saw Reuben Ricks and had an interview with him about his hogs. In this interview Reuben Ricks "claimed that they (the hogs) were marked with a crop and underbit in each ear." He did not claim to have any hogs marked with a swallow-fork and underbit in each ear. Robinson also states that "neither Reuben or John Ricks claimed the hogs if they were marked with a swallow-fork and underbit in each ear."

These declarations of Reuben and John being made after the consummation of the conspiracy,— conceding for the argument that a conspiracy had once existed,— to their admissibility against appellant his counsel objected. The learned judge, however, upon this matter instructed the jury as follows: "That the declarations of John and Reuben Ricks, made when the defendant Asberry Ricks was not present, and admitted in evidence, are competent evidence to show the intent with which said John and Reuben Ricks acted in the matter, but are not binding on the defendant Asberry Ricks, nor competent to prove knowledge or intent on the part of defendant Asberry Ricks."

Neither Reuben nor John, but defendant alone, was on trial. If these parties had conspired together to steal Robinson's hogs, the conspiracy was at an end. Hence the acts and declarations of a coconspirator were not admissible against a fellow conspirator. But the learned judge instructed the jury that these declarations were admitted to show "the intent of Reuben and John, but could not be used to prove the knowledge or intent of defendant." Now we cannot possibly comprehend how the intent of John and Reuben could be material to or have any bearing on this case, unless it be

to show the intent of Asberry. Under the peculiar facts of this case, the intent was the pivotal point, and was very properly understood to be so by the learned judge below; hence this charge. In this case the intent is the gist of the offense, and, in order to convict the jury must be satisfied from the evidence that defendant took the hogs of O. B. Robinson with a criminal intent — that is, with intent to steal them.

The intent being the turning point under the facts of this case, it was of the first importance for the State to establish this point against defendant by proof of some fact or circumstance showing a fraudulent or thievish intent. The declarations of Reuben and John, now under discussion, had a strong tendency to make this proof. Reuben, John and Asberry are charged with theft; the issue, the pivotal point, is the intent of Asberry. There is proof that the parties acted together. The State proves that Reuben and John were prompted by a fraudulent or thievish intent. Asberry acted with Reuben and John. Inference: Asberry acted with the same fraudulent intent.

But the jury were told that these declarations could not be used for the purpose of proving the intent of Asberry. Then for what purpose could they be used? To show the intent of Reuben and John we are told. But what has the intent of Reuben and John to do with this case (they were not on trial), if their intent would not elucidate the intent of defendant? These declarations were most certainly and clearly inadmissible for want of relevancy, unless for that purpose.

It may be urged, however, that, as the jury were instructed that the declarations of Reuben and John were not binding on defendant, nor competent to prove knowledge or intent on his part, therefore all that was calculated to injure defendant was withdrawn from the consideration of the jury, and hence there is no wrong shown to appellant. Under the facts of this case we cannot agree to such a conclusion. These declarations were not withdrawn from but left to the consideration of the jury, and, as we have seen, they could serve but one purpose; that is, to show an identity of intent on the part of all concerned. There was eminent danger that the jury used them for this purpose. From the fact that they were left with the jury, and could serve but one purpose, the inference is quite probable that they were applied to that purpose by the jury; and hence the defendant was injured thereby.

In his opening speech the district attorney said: " Gentlemen of the jury, the witnesses for the defense have sworn lies, and have

come here for that purpose. I will show it by the testimony. They know that they have sworn lies, and if it was not so they would not allow me to say it, but would make mince meat out of me when I charge them with having done so." We deem it proper — yea, an imperative duty on our part — to sternly and emphatically condemn such conduct. Such bullying and defiant conduct was highly calculated to provoke the most serious results, and that, too, in the very temple of justice; a place in which the highest order and decorum should be preserved.

The district attorney was not content to brand the witnesses as perjured liars, but calls the jury to witness that he proves the charge. How? Because they will not resent the terrible insult by at least an aggravated assault and battery,— thus subjecting themselves to fine and imprisonment. Such conduct should not be tolerated for a moment, and if the court had knowingly permitted the same, we would feel it our duty to reverse the judgment because of this matter. However, the court's attention was not called to this matter at the time, and when this was done the court reproved the attorney by stating that such remarks were highly improper. We think from the circumstances and nature of the remarks that the court should have gone further by instructing the jury that the credibility of the witnesses could not be tested in any such manner; but, as this matter will not arise upon another trial, we deem it unnecessary to determine whether or not it is reversible error.

Appellant proposed to prove that the general reputation for truth and veracity of Gentry, a witness for defendant, was good, because attacked by the district attorney in his argument. We have found no case or authority holding that such proof can be made unless the credibility of the witness is attacked, or attempted to be questioned, by some evidence adduced on the trial. There was no error in refusing this proof.

We have examined the other matters complained of in the very able brief of appellant's counsel, but fail to find a reversible error save the assignment that the verdict and judgment are not supported by the evidence. We will not discuss at length the evidence as presented in the statement of facts; but after a very careful perusal of the same, we are impressed with the conviction that it is not sufficient to support this conviction.

As already observed, the intent with which defendant participated in this transaction was the vital question in the case. Now, upon this point we are clearly of the opinion that the evidence for the State, the weight of the testimony, negatives the fraudulent in-

tent. We are satisfied that no impartial mind can read the evidence and arrive at any other conclusion. This is not a case of conflicting testimony upon the question of intent. Giving, therefore, to the evidence its greatest criminative force, and yet its cogency will be found insufficient to warrant conviction.

Because the court erred in admitting the declarations of John and Reuben Ricks, and because the verdict is not supported by the evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered November 11, 1885.]